[No. 11021. *En Banc.* October 6, 1913.]

The State of Washington, *Respondent*, v. Mountain Timber Company, *Appellant*.[1]

Jury—Right to Jury Trial—Master and Servant—Right of Action—Industrial Insurance. The compulsory industrial insurance law, requiring men engaged in hazardous occupations likely to result in injuries to employees to waive certain rights and privileges, and requiring employees about to engage therein to give up personal rights of contract and to contract with reference to the law, was adopted to avoid the delay and frequent injustice incident to civil trials; and to sustain the law by reference to the police power requires that every incident to the law and the methods necessary to make it effective be likewise exempted from the proscriptions and limitations of the constitution; hence it is not unconstitutional as denying the right to trial by jury, although it abolishes rights of action and defenses, in certain cases, and in certain cases denies the right of trial by jury.

Constitutional Law—Police Power—Scope. The police power is as broad as the public welfare and as strong as the arm of the state, and its scope is to be measured by the legislative will of the people in acts passed in affirmance of established usage or of such standards of morality and expediency as have, by gradual process and accepted reason, become so fixed as to fairly indicate the better will of the people in their social, industrial and political development.

Jury—Right to Jury Trial—Constitutional Provisions. The right to trial by jury guaranteed by the Federal constitution does not apply to state courts or to prosecutions for the violation of state laws.

[1]Reported in 135 Pac. 645.

CONSTITUTIONAL LAW—REPUBLICAN . FORM OF GOVERNMENT. The compulsory industrial insurance law does not violate the Federal constitutional guarantee of a republican form of government.

Appeal from a judgment of the superior court for Cowlitz county, McKenney, J., entered August 14, 1912, in favor of the plaintiff, upon overruling a demurrer to the complaint, in an action to recover premiums due under the provisions of the industrial insurance act, after a trial to the court. Affirmed.

*Edmund C. Strode, A. H. Imus,* and *Coy Burnett,* for appellant.

*The Attorney General* and *S. H. Kelleran, Assistant,* for respondent.

CHADWICK, J.—We are invited by the appellant to reconsider our discussion of the industrial insurance law, Laws 1911, ch. 74, p. 345.

It is insisted that it is unconstitutional in that (1), it is in violation of art. 1, § 4 of the constitution of the United States, which guarantees to every state a republican form of government; (2) of the 4th amendment of the constitution, which secures all of the people against unreasonable searches and seizures of their person and effects; (3) of the 5th and 7th amendments, in that the act deprives plaintiff of its property without due process of law, and for a public use without just compensation, and deprives it of the right of trial by jury; (4) of the 14th amendment, in that it grants privileges and immunities and deprives plaintiff of its property without due process of law and of equal protection of the laws; for the like reason, that it violates art. 1, §§ 3, 4, 7, 16 and 21, of the constitution of the state of Washington.

The court, as at present constituted, is not disposed to recede from or qualify its opinion as expressed in the case of *State ex rel. Davis-Smith Co. v. Clausen,* 65 Wash. 156, 117 Pac. 1101, 37 L. R. A. (N. S.) 466. The right of trial by jury under the seventh amendment to the constitution of the

United States, the question of a delegation of judicial powers to the industrial insurance commission, and the contention that the law violates the Federal guarantee of a republican form of government, are possibly not covered by the argument of the court in *State ex rel. Davis-Smith Co. v. Clausen*, *supra*.

When we say that we sustain a law by reference to the police power that might otherwise be in conflict with some provision of the constitution, it would seem that every incident to that law, as well as all methods necessary to make it effective, are likewise exempted from the proscriptions and limitations of the constitution. The legislature has adopted the *idea* of industrial insurance, and seen fit to make that idea a workable one by putting its execution, as well as its administrative features, in the hands of a commission. It has abolished rights of actions and defenses and in certain cases denied the right of trial by jury. The legislature has said to the man whose business is a dangerous one and the operation of which may bring injury to an employee, that he cannot do business without waiving certain rights and privileges heretofore enjoyed, and it has said to the employee that, inasmuch as he may become dependent upon the state, that he must give up his personal right of contract when about to engage in a hazardous occupation and contract with reference to the law. These demands are the fundamentals of our industrial insurance law. If the law is not administered as therein provided, it is not likely that a compulsory law such as it is could ever be adequately administered; for, aside from its humane purpose, it was adopted in order that the delay and frequent injustice incident to civil trials might be avoided.

"The remedy of the workman has been uncertain, slow and inadequate. Injuries in such works, formerly occasional, have become frequent and inevitable." Laws 1911, page 345.

To uphold the law in the sense of sustaining the *idea* of industrial insurance, and to deny the right of executing it without the intervention of the courts, would throw us back on the

original ground and we should then, if consistent, hold the *idea* of industrial insurance to be beyond the limit of the police power.

Police power has been defined as often as changed conditions have required or compelled its extension, although discriminating lawyers and able judges have recognized that there can be no fixed definition. In other words, courts have made a definition to fit the state of facts before them, always admitting that a different state of facts might call for another definition.

It is a long reach between the definition of Sir William Blackstone and our present terminology of the police power. That eminent writer thus defined the term:

"The due regulation and domestic order of the kingdom, whereby the individuals of the state, like members of a well-governed family, are bound to conform their general behavior to the rules of propriety, good neighborhood, and good manners, and to be decent, industrious, and inoffensive in their respective stations." 4 Blackstone, Commentaries, 162.

The germ of police power, in so far as it assumes to interfere with private rights, is to be found in the power of the state to suppress nuisances. This right was forced upon the state in the exercise of its functions, or rather duty, to preserve that equilibrium of relative right which must be preserved wherever society is organized. This is indicated by the conception of Kent who found the police power to be "the power to regulate unwholesome trades, slaughter houses, operations offensive to the senses." In the definition of Chief Justice Shaw will be found a wider limit. He described it as:

"The power vested in the legislature by the constitution to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power than to

mark its boundaries, or prescribe limits to its exercise." *Commonwealth v. Alger,* 7 Cush. 53, 85.

In the case of *Butchers' Union Slaughter-House Co. v. Crescent City Livestock Landing Co.,* 111 U. S. 746, it is suggested that the public health and public morals are matters of legislative concern, and of which the legislature cannot divest itself. In *State ex rel. Beek v. Wagener,* 77 Minn. 483, 80 N. W. 633, 778, 1134, 77 Am. St. 681, 46 L. R. A. 442, it is said that the exercise of the police power is not confined to matters relating to the public health, morals and peace, but there may be interference whenever the public interest demands it. In *Champer v. Greencastle,* 138 Ind. 339, 35 N. E. 14, 46 Am. St. 390, 24 L. R. A. 768, the court said that "It is known when and where it begins but not when and where it terminates." The insinuation that there may be an exhaustion of the power may well be doubted in the light of the words of Mr. Justice Holmes:

"It may be said in a general way that the police power extends to all the great public needs. *Camfield v. United States,* 167 U. S. 518. It may be put forth in aid of what is sanctioned by usage, or held by the prevailing morality or strong and preponderant opinion to be greatly and immediately necessary to the public welfare." *Noble State Bank v. Haskell,* 219 U. S. 104.

Our own cases, those cited in *State ex rel. Davis-Smith Co. v. Clausen, supra,* and *Karasek v. Peier,* 22 Wash. 419, 61 Pac. 33, 50 L. R. A. 345; *Bowes v. Aberdeen,* 58 Wash. 535, 109 Pac. 369, 30 L. R. A. (N. S.) 709; *Tacoma v. Boutelle,* 61 Wash. 434, 112 Pac. 661; *Shepard v. Seattle,* 59 Wash. 363, 109 Pac. 1067, 40 L. R. A. (N. S.) 647; *State ex rel. Webster v. Superior Court,* 67 Wash. 37, 120 Pac. 861; *State v. Somerville,* 67 Wash. 638, 122 Pac. 324, show a like growth in liberal interpretation.

"In the exercise of police power the legislature may, to a reasonable extent, and with due regard to the public welfare, prohibit or regulate the use of private property; but any pro-

vision or regulation of the use and enjoyment of land by the owner which is not limited to the prevention of .nuisances is opposed to constitutional principles; and the power of the legislature to prohibit nuisances is confined to the prohibition or regulation of such acts as violate, or materially interfere with, the rights of others." *Karasek v. Peier.*

"Incapability of definition, however, does not destroy the right of the public to safeguard property, insure the general health, protect the morals, preserve the peace, or compel the use of property consistent with surrounding conditions by the exercise of arbitrary power and in disregard of the primary right of the individual. A subject when measured by other conditions may warrant its exercise; whereas, if the relative condition be lacking, the power will be denied. Its exercise in proper cases marks the growth and development of the law rather than, as some assert, a tyrannical assertion of governmental powers denied by our written constitutions. Although the fundamental truths must from their very nature remain unchanged, the right of property is a legal right and not a natural right, and it must be measured always by reference to the rights of others and of the public. Neither an individual nor the public has the right to take the property of another and put it to a private use. But it would be manifestly destructive to the advancement or development of organized communities to put the public to the burden of rendering compensation to one, or to many, when the individual use is, or might be, a menace to the health, morals, or peace of the whole community." *Bowes v. Aberdeen.*

"All courts concede the impossibility of adopting fixed rules by which to test the validity of laws passed under the police power. It covers a wide range of subjects, but is especially occupied with whatever affects the peace, security, health, morals, and general welfare of a community. While originally it was used as a rule to indicate the protective function of the government, its development of late years has been in the direction of the function of the state that cares for the general welfare." *Tacoma v. Boutelle.*

"There are many unpleasant and annoying things that must be borne by those living in a state of organized society, in order that others may enjoy their equal rights under the law, but the preservation of the public health and public safety

is one of the chief objects of local government, and every citizen holds his property subject to a reasonable exercise of the police power of the state." *Shepard v. Seattle.*

"The test of a police regulation, when measured by this clause of the constitution [§ 3, art. 1.] is reasonableness, as contradistinguished from arbitrary or capricious action. . . . There is no absolute right to do as one wills, pursue any calling one desires, or contract as one chooses . . . liberty means absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community." *State ex rel. Davis-Smith Co. v. Clausen.*

"The police power of the state is more than an attribute of sovereignty. It, like the power of taxation, is an essential element of government, and exists in every state without express declaration and without limitation, in so far as it is made to apply to the health, peace, comfort, and morals of the people. Formerly applied strictly and directly, it has now, because of changed economic conditions, come to be more favored, and is frequently relied upon to sustain laws which but indirectly affect the common good." *State ex rel. Webster v. Superior Court.*

"The police power which may be invoked to protect the health, property, welfare, and morals of citizens is an inherent attribute of sovereignty, the exercise of which is necessary to secure good government and promote the public welfare. Circumstances and occasions calling for its exercise have multiplied with marvelous rapidity in recent years, by reason of the well-recognized fact that modern, social and economic conditions have called into existence agencies previously unknown; many of which so vitally affect the health and physical condition of laborers, especially female laborers, that legislation of the character here involved has been sustained with greater liberality than was formerly evinced under less exacting conditions." *State v. Somerville.*

It will be seen that what was originally a rule of inclusion and of exclusion and incapable of exact definition, has developed into a rule of most frequent inclusion. From the peace of the community and the suppression of nuisances, we have undertaken to regulate things hitherto considered private.

To illustrate: We have held that the legislature may enact laws for the promotion of health; provide for the marketing of food products; prevent fraud in the disposition and sale of goods; prevent the doing of certain work and the pursuit of certain occupations upon the Sabbath day; regulate certain trades, businesses and professions; limit the hours of labor upon public works, and fix hours of labor for women; enact drainage laws and fill low lands where drainage is impractical. These are a part, only, of the subjects touching private affairs treated under the police power and sustained as needful and proper regulations. Moreover, it has been held that there may be a legal liability without fault and that crimes may be committed without intent.

Having in mind the sovereignty of the state, it would be folly to define the term. To define is to limit that which from the nature of things connot be limited, but which is rather to be adjusted to conditions touching the common welfare, when covered by legislative enactments. The police power is to the public what the law of necessity is to the individual. It is comprehended in the maxim *salus populi suprema lex*. It is not a rule, it is an evolution.

The supreme court of the United States on rehearing in *Noble State Bank v. Haskell*, 219 U. S. 575, 580, says of its discussion in the principal case,

"The analysis of the police power, whether correct or not, was intended to indicate an interpretation of what has taken place in the past not to give a new or wider scope to the power."

It is claimed that this is a qualification of Justice Holmes' definition. We think not. The power has always been as broad as the public welfare and as strong as the arm of the state. We understand the court to mean that conditions have not heretofore called for its final expression. The scope of the police power is to be measured by the legislative will of the people upon questions of public concern, not in acts passed in response to sporadic impulses or exuberant displays of

emotion, but in those enacted in affirmance of established usage or of such standards of morality and expediency as have by gradual processes and accepted reason become so fixed as to fairly indicate the better will of the people in their social, industrial and political development. If, then, the executive and judicial departments unite to uphold the will of the legislative department, it may fairly be said that all reasonable men can agree that the act is essential for the preservation of the public welfare and that the constitution does not apply.

Whether our present tendency is for the common good, has excited and will continue to excite controversy. That it has so far been sustained by a dispassionate preponderant public opinion, is not to be denied. Hence, to hold the *idea* of industrial insurance to be constitutional—an idea never offends against a constitution that guarantees free speech and free press—and to hold its incidents and machinery when molded into law to be inoperative because of some constitutional limitation, would lead to absurd results.

"Large discretion is necessarily vested in the legislature when exercising that [police] power, and that the legislature may determine not only what the public interest demands, but also what measures are requisite and necessary to secure and protect the same." *State v. Somerville, supra.*

In the same case, the writer of this opinion concurred specially, saying in part:

"Until the supreme court of the United States decides otherwise, I am willing to hold—for I believe it is the only consistent thing for the court to do—that in all cases pertaining to the police power, the legislature is supreme unless the general application of the law does violence to the common knowledge of men, in which event a court might properly intervene."

See, also, *State v. Considine,* 16 Wash. 358, 47 Pac. 755.

Our argument upholding the right of the legislature to provide for the execution and administration of the law without resort to the courts is sustained in principle by our decision in the case of *Davison v. Walla Walla,* 52 Wash. 453, 100

Pac. 981, 132 Am. St. 983, 21 L. R. A. (N. S.) 454, where we held, citing apt authority, that a city might exercise its police power without resort to judicial proceedings.

In so far as the right to a trial by jury under the Federal constitution is concerned, this court has decided that the guarantee of the Federal constitution of the right of trial by jury has no application in the state courts or to prosecutions for the violation of state laws. *State v. McDowell*, 61 Wash. 398, 112 Pac. 521, Ann. Cas. 1912 C. 782, 32 L. R. A. (N. S.) 414.

The contention that the industrial insurance law is in violation of the guarantee of a republican form of government needs no discussion. It is disposed of by reference to the late cases. *Pacific States Telephone & Telegraph Co. v. Oregon*, 223 U. S. 118; *Kiernan v. Portland*, 223 U. S. 151.

We recognize that this case is appealed to this court in order to bring it to the future attention of the supreme court of the United States. A more extended argument would serve no real purpose. The following cases should be read in connection with our present discussion: *Cunningham v. Northwestern Imp. Co.*, 44 Mont. 180, 119 Pac. 554; *State ex rel. Yaple v. Creamer*, 85 Ohio St. 349, 97 N. E. 602; *Borgnis v. Falk Co.*, 147 Wis. 327, 133 N. W. 209; *Mondou v. New York, N. H. & H. R. Co.*, 223 U. S. 1; *Chicago v. Sturges*, 222 U. S. 313; *Barron v. Baltimore*, 7 Pet. 243; *Smith v. Maryland*, 18 How. 71; *Flint v. Stone Tracy Co.*, 220 U. S. 107; *Spies v. Illinois*, 123 U. S. 131; *Thorington v. Montgomery*, 147 U. S. 490; *Fallbrook Irrigation Co. v. Bradley*, 164 U. S. 112.

The judgment of the lower court is affirmed.

ALL CONCUR.